# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47868-4-II |
| Respondent, | |
| v. | |
| ANTHONY A. MORETTI, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Anthony Moretti appeals his conviction and sentence for robbery in the first degree and two counts of assault in the second degree. He argues that the prosecutor committed misconduct, that the trial court erred by denying a mistrial, and that his attorney provided ineffective assistance of counsel. As to his sentence under the Persistent Offender Accountability Act (POAA) of the Sentencing Reform Act of 1981 (SRA), ch. 9.9A RCW, Moretti argues that it constitutes cruel and unusual punishment, that he was entitled to prove his prior convictions to a jury, and that the State failed to meet its burden of proof. Moretti also argues that the sentencing court failed to consider Moretti's actual ability to pay before imposing legal financial obligations (LFOs).[1] Additionally, Moretti raises a number of issues in his statement of additional grounds (SAG), including whether or not any of his convictions violate double jeopardy. We affirm, but remand for the trial court to strike all discretionary LFOs and to amend the judgment and sentence to vacate the assault in the second degree conviction against Knapp.

---

[1] Moretti asserts we should not impose appellate costs. Pursuant to RAP 14.2, a commissioner of this court will decide the issue if the State submits a cost bill and Moretti objects to it.

FACTS

I.     THE INCIDENT

In the afternoon of September 11, 2014, Michael Knapp and his roommate, Tyson Ball, drove to a boat launch in Oakville to buy methamphetamine from a woman, later identified as Halli Hoey.  Knapp had approximately $1,000 on him.

On route to the boat launch, Ball texted with an acquaintance, Jonathan "Jon" Charlie, whom he described as a "heavier guy, big[,] tall."  Report of Proceedings (RP) (July 14, 2015) at 112.  They discussed that a woman would meet Knapp and Ball at the boat launch.  When Knapp and Ball reached the boat launch, they saw Hoey.  Because Hoey did not have drugs with her, Knapp and Ball left.  Ball thought Hoey looked nervous.

Approximately 20 minutes later, Hoey called Ball to ask if he and Knapp could help jump start her car.  When Ball and Knapp went back to the boat launch, a man approached them and asked Knapp for a cigarette.  Hoey looked "way more nervous" than before.  RP (July 14, 2015) at 117.

Ball and Knapp gave somewhat inconsistent testimony.  Ball testified that as Knapp and the man were speaking, the man pulled a bat from his pants.  Because Knapp was "an old man," Ball pushed Knapp behind him and was hit with the bat on the arms.  RP (July 14, 2015) at 119.  Once the man began attacking Ball with the bat, a second man came out of the bushes.  The second man, armed with an ASP,[2] hit Ball on the head multiple times.  Ball escaped and ran off.

Knapp testified that no one asked for a cigarette before he and Ball were attacked.  When Ball got out of the truck to help Hoey, Knapp saw a man running out of the bushes with a baseball

---

[2] An "ASP" is an expandable metal baton.

bat. He immediately recognized the man as Samuel "Sam" Hill, a person he knew. Knapp tried to help Ball, when a second man jumped out of the bushes and began beating Knapp with an ASP. Ball ran off and both assailants attacked Knapp.

While both assailants attacked Knapp, they said "give me the money." RP (July 14, 2015) at 123. Knapp tried to defend himself and pulled out a knife, but was "beat down" to the ground. RP (July 14, 2015) at 166. The assailants beat Knapp's head while they continued to demand money. Knapp complied. Once they had the money, the assailants ran away. Hoey drove off during the assault.

When law enforcement officers reached Knapp, he had a laceration above his left eye, blood soaked clothes, and a grossly swollen ear. Injuries on Knapp's hands and arms appeared to be defense wounds.

Knapp provided Hill's name to the police as one of the assailants. The officers obtained a description of the second assailant, "[f]ive seven, slight build, lighter skin," later identified as Anthony Moretti. RP (July 15, 2015) at 217. The officers showed Ball a photo montage. Ball identified Moretti as one of the assailants. The police also showed Knapp a photo montage. Knapp identified Moretti as one of the assailants.

Officers contacted Moretti approximately two months later and arrested him. Moretti stated he had no involvement in the incident and did not know anyone involved.

On March 23, 2015, the State charged Moretti with robbery in the first degree and two counts of assault in the second degree, one for the assault against Knapp and one for the assault against Ball. The State filed a notice that Moretti may be a persistent offender subject to total confinement for life without the possibility of release.

3

II.     DETECTIVE KEITH PETERSON'S TESTIMONY

At trial, Peterson testified that he did not include Charlie in the photo montages because "early on in the investigation . . . there were three persons who identified the defendant as the person . . ." RP (July 14, 2015) at 93. Moretti objected based on hearsay and the court sustained the objection.

After Peterson stated that he recognized Moretti from his investigation of the incident, the prosecutor asked him whether he had any prior dealings with Moretti. Moretti objected based on relevance and the court sustained the objection.

The prosecutor next asked Peterson what information he obtained from Hill regarding his involvement in the incident. Before Peterson responded, Moretti objected and the trial court sustained the objection. The prosecutor countered, "Your Honor, it's co-defendant, co-conspirator in this case." RP (July 15, 2015) at 218.

Outside the presence of the jury, Moretti moved for a mistrial. In the alternative, he asked that he be able to tell the jury that Hill was acquitted of a robbery charge in a separate trial. The court denied both motions, stating:

> I just have trouble with saying that in this case, the defendant has been severely prejudiced by the mention of co-defendant when it's been coming in loud and clear that there were two actors and one was clearly Mr. Samuel Hill. So [the prosecutor] kind of said co-defendant and then said co-conspirator and it just to me is not something where I would declare a mistrial.

RP (July 15, 2015) at 221-22.

Later, the prosecutor asked Peterson whether law enforcement officers attempted to identify other individuals involved in the incident. Moretti objected based on hearsay, but the trial court overruled the objection. Peterson continued, stating, "We were able to identify a female

4

named Halli Hoey who was acquainted with Mr. Hill . . . [and] another person named Jon, who we later learned was Jonathan Charlie." RP (July 15, 2015) at 232.

When the prosecutor asked Peterson several other questions regarding how Charlie's description was important to the investigation, what in Knapp's version of events and Ball's version of events were different, and what information matched the evidence that he collected during the investigation, Moretti objected to each question. The trial court sustained every objection.

The prosecutor continued and asked whether, after speaking with Ball, other persons of interest developed. Moretti again objected and the court sustained the objection. The prosecutor then asked what happened in the investigation after that point. Peterson responded, "We inevitably identified Mr. Moretti as a —." RP (July 15, 2015) at 237. Moretti objected and the court sustained the objection.

III.     HALLI HOEY'S TESTIMONY

On the day of the incident, Hoey was with Charlie and Hill. Charlie asked Hoey to take him to Oakville to meet people at the river. He had a backpack with the end of a bat sticking out of it.

Hoey drove Charlie and Hill to the boat launch. On the way, Charlie and Hill saw one of their friends walking down the road and asked Hoey to pick the friend up. The friend was a "bald," "[w]hite man" whom Hoey did not know. RP (July 15, 2015) at 290.

When they arrived at the boat launch, no one was there. Charlie and Hill got out of the car. Eventually, a truck with two men arrived. Hoey did not talk to the men from the truck. She heard Charlie talking to the men, but they began yelling about money or drugs. When she saw a knife on the older man, Hoey immediately drove off.

The following morning, law enforcement officers contacted Hoey. She spoke with the officers about the incident. According to Hoey, one officer "wrote down in his own words what he thought happened." RP (July 15, 2015) at 296. The statement said that Charlie asked Hoey to give him a ride so he could "sell [m]eth." RP (July 15, 2015) at 306. Hoey denied knowing she was going to a drug deal and felt pressured into signing the document.

Hoey also testified that she never provided the law enforcement officers with Moretti's name. Peterson impeached her testimony when he testified that, approximately one week after the incident, Hoey provided him with a description of the man she picked up—"white male, five seven, slender build"—and that she had been "introduced by the other persons in the car as Anthony." RP (Jul. 15, 2015) at 320-21.

Hoey denied that she identified the unknown man, but later identified Moretti in court as the man she picked up on the road while driving to the boat launch.

IV.    MORETTI ASSERTS JUROR OBSERVED HIM IN RESTRAINTS

Near the close of trial, Moretti contended that during recess, a juror saw him in restraints while being brought back to the courthouse. Moretti feared that the juror would relate her observations to the other jurors and he moved for a mistrial. The court and the parties questioned the juror.

The juror said that she did not see Moretti being brought back into the courthouse. She stated that she was walking up the stairs and passed by Moretti on the second floor. The juror did not notice whether or not he had restraints on. She mentioned to other jurors that she saw him, but said nothing else.

Moretti moved the court to excuse the juror. The court stated that Moretti could renew his motions at the end of trial before deliberations. The court stated that it had no reason to disbelieve the juror.

A courthouse security officer next addressed the court and stated that when Moretti exited the elevator, he no longer had restraints on because they were removed in the elevator. If the juror saw him, Moretti did not have restraints on. The court again denied Moretti's motions for a mistrial and to excuse the juror, and restated that Moretti could renew his motions at the end of trial.

At the close of the State's case, the court asked Moretti if he wished to renew his motion for mistrial. Moretti declined, stating, "[W]e're not going to have any motions on that matter. We're fine with the jury as it's seated." RP (July 16, 2015) at 379.

V.      JURY INSTRUCTIONS

The trial court received proposed instructions submitted by the State. Moretti did not propose instructions, but objected to the order of the instructions and to the accomplice liability instruction. After addressing the objections, the parties agreed on the final instructions.

After the trial court read the instructions to the jury, the court noticed that the robbery in the first degree instruction did not include a deadly weapon element. Moretti moved for a mistrial, but the court denied the motion. It cured the error by informing the jury about the inconsistency, replacing the hard copy of the instruction with a corrected copy, and reading the corrected instruction to the jury.

VI.    PROSECUTOR'S CLOSING ARGUMENT

During closing argument, the prosecutor argued the "givens"[3] in the case:

It's a given that Mr. Knapp had money.  He had big casino winning[s]. . . . Everybody knew.  It was a small community. . . .  It's reasonable to believe that he's going to [sic] there to buy drugs.  He's got money on him. . . .  These guys knew it.  They wanted that money.  They set him up, met him in a secluded area . . . both armed.  Those are a given.  Mr. Knapp was attacked.  Mr. Ball was attacked.  Those are given.  You've seen the injuries.  There's no doubt.

RP (July 16, 2015) at 392.

Referring to Knapp and Ball, the prosecutor argued that based on the testimony, there was "no evidence that those guys started anything."  RP (July 16, 2015) at 392-93.  She argued that it was "a given that the defendant, it doesn't matter which one, asked give me the money."  RP (July 16, 2015) at 393.  The prosecutor continued:

And there's no doubt that the defendant was with Sam Hill and that he was involved in this, and there's no doubt that Mr. Moretti was the second man.  And this case, Ladies and Gentlemen, there's no doubt that Mr. Moretti is guilty of all of the charges.

RP (July 16, 2015) at 395.  In rebuttal, the prosecutor argued:

And Ms. Hoey, she has her own reasons for not testifying as clearly as she did, but that doesn't give Mr. Moretti a pass. None of that does.
    The fact that you may not like him doesn't give Mr. Moretti a pass for what he did. He's clearly implicated in this case. He's clearly identified. He's clearly involved. He clearly had assaulted Mr. Ball and Mr. Knapp. He clearly robbed Mr. Knapp along with Sam Hill.
    In this case all that matters is what happened and what he did. You shouldn't give [Moretti] a pass simply because there was some misinformation initially or simply because you don't like what they were there to do. But again, that's not what you're here for. You're here to determine whether or not Mr. Moretti is innocent or guilty of the charges against him.

---

[3] In his opening statement, Moretti's attorney stated in reference to the evidence and testimony, "Nothing is a given here."  RP (July 14, 2015) at 94.

RP (July 16, 2015) at 403-04. The prosecutor stated that "[n]o one" besides Hill and Moretti were suspects in the assault and robbery. RP (July 16, 2015) at 402.

The jury returned a guilty verdict on all three counts.

VII. SENTENCING

At sentencing, the State submitted certified copies of the judgment and sentences for Moretti's prior convictions of arson in the first degree and vehicular assault. The State included the respective charging documents and plea agreements.

The State argued that Moretti's prior offenses were strike offenses; there was no "wash out," and the law required a life sentence without the possibility of release. RP (July 24, 2015) at 419. Moretti agreed. Moretti's attorney stated that he advised Moretti at the onset of the case that this was a "third strike" case. RP (Jul. 24, 2015) at 420.

The trial court sentenced Moretti, a 32 year old, to a term of total confinement for life without the possibility of release on all three convictions and imposed LFOs.

Moretti appeals.

ANALYSIS

I. PROSECUTORIAL MISCONDUCT

Moretti argues that he did not receive a fair trial because of the prosecutor's repeated misconduct. We disagree.

"Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). An appellant claiming prosecutorial misconduct must demonstrate that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 759-61, 278 P.3d 653 (2012). To

establish prejudice, the appellant must then show that the improper comments had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 760-61.

But when the defendant failed to object to the improper comments at trial, the defendant must also show that the comments were "so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. The appellant must show that (1) no curative instruction would have eliminated the prejudicial effect, and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 761. The focus of this inquiry is more on whether the resulting prejudice could have been cured, rather than the flagrant or ill-intentioned nature of the remarks. *Emery*, 174 Wn.2d at 761-62.

A.      EVIDENCE ISSUES

Moretti argues that the prosecutor elicited improper hearsay evidence over objection, and that the trial court erred by denying a mistrial on that basis. He argues that the prosecutor persistently attempted to introduce evidence that was irrelevant and "extremely prejudicial." Br. of Appellant at 21. We disagree.

1.      No Improper Evidence

If a witness testifies on the basis of his or her own observation, it is not hearsay. *State v. Powell*, 126 Wn.2d 244, 265, 893 P.2d 615 (1995). A prior statement by a witness is not hearsay if the declarant testifies at trial and is subject to cross-examination concerning the statement, and the statement is one of identification of a person made after perceiving the person. ER 801(d)(iii); *State v. Grover*, 55 Wn. App. 252, 256, 777 P.2d 22 (1989).

When a statement is offered to show why an officer conducted an investigation, it is not hearsay and it is admissible. *State v. Iverson*, 126 Wn. App. 329, 337, 108 P.3d 799 (2005). Nor

is it hearsay if the testimony is offered to give context for the investigation. *State v. Chenoweth*, 188 Wn. App. 521, 534, 354 P.3d 13, *review denied*, 184 Wn.2d 1023 (2015).

As an initial matter, Moretti offers no substantive argument or authority to show why the challenged evidence was "extremely prejudicial, inadmissible hearsay." Br. of Appellant at 25. We are not required to review issues without adequate briefing. RAP 10.3(a)(6); *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 808, 225 P.3d 213 (2009). Even if we do review the issue, Moretti cannot show that the prosecutor committed misconduct.

Here, the trial court properly sustained objections to hearsay or testimony that went beyond the scope of an identification statement. But the admitted testimony was proper as it related to Peterson's investigation of the incident and his observations. Further, all of the witnesses that testified as to the identification of the individuals were subject to cross-examination. Moretti offers no evidence to suggest that the prosecutor attempted to elicit extremely prejudicial evidence. Even if he could show that the prosecutor's conduct was improper, Moretti offers no argument that the conduct was so prejudicial that it had a substantial likelihood of affecting the jury's verdict. Therefore, we conclude the prosecution's conduct was proper because the testimony was proper.

2.      Denial of Motion for Mistrial

In the same vein, Moretti argues that the trial court erred by declining to grant a mistrial when the prosecution improperly referred to Hill as Moretti's "codefendant" or "coconspirator." Br. of Appellant at 25. We disagree.

We review a trial court's denial of a mistrial for an abuse of discretion. *State v. Rodriguez*, 146 Wn.2d 260, 269, 45 P.3d 541 (2002). We find an abuse of discretion only when "'no reasonable judge would have reached the same conclusion.'" *Rodriguez*, 146 Wn.2d at 269 (quoting *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)). "A trial court's denial of

a motion for mistrial will only be overturned when there is a substantial likelihood that the error prompting the mistrial affected the jury's verdict." *Rodriguez*, 146 Wn.2d at 269-70 (internal quotations omitted). Further, we have held that "trial courts 'should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly.'" *Rodriguez*, 146 Wn.2d at 270 (quoting *State v. Mak*, 105 Wn.2d 692, 701, 718 P.2d 407 (1986)).

The evidence at trial established that Hill acted in concert with Moretti. The court also instructed the jury on accomplice liability. Moretti cannot show that the prosecutor's reference to Hill as "codefendant" or "coconspirator" constituted error. Even if he could, Moretti cannot show that he was so prejudiced that nothing short of a new trial could insure he be tried fairly. Therefore, we conclude that the trial court did not abuse its discretion by denying Moretti's motion for mistrial.

    B.      OPINION TESTIMONY AND BOLSTERING WITNESSES

Moretti argues that the prosecutor repeatedly introduced improper opinion testimony from law enforcement officers regarding his guilt, credibility, and veracity. He argues that the prosecutor flagrantly bolstered its witnesses throughout trial. We disagree with Moretti's arguments.[4]

Opinion testimony is that which is "based on one's belief or idea rather than on direct knowledge of the facts at issue." *State v. Demery*, 144 Wn.2d 753, 760, 30 P.3d 1278 (2001) (internal quotations omitted). "[W]itnesses may not testify as to the guilt of the defendants, either directly or by inference. Such an improper opinion undermines a jury's independent determination

---

[4] The State argues that Moretti did not object to any of the cited instances of improper opinion testimony and bolstering. Even though Moretti did not object at trial, we decide the issue on the merits.

of the facts, and may invade the defendant's constitutional right to a trial by jury." *State v. Olmedo*, 112 Wn. App. 525, 530-31, 49 P.3d 960 (2002) (internal citation omitted).

"Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury." *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007). Similarly, "[p]ermitting a witness to testify as to the defendant's guilt raises a constitutional issue because it invades the province of the jury and the defendant's constitutional right to a trial by jury." *Olmedo*, 112 Wn. App. at 533. An error of constitutional magnitude is presumed prejudicial, and the State bears the burden of proving the error was harmless beyond a reasonable doubt. *State v. Spotted Elk*, 109 Wn. App. 253, 261, 34 P.3d 906 (2001). "A constitutional error is harmless only when the untainted evidence provides an overwhelming conclusion of guilt." *Olmedo*, 112 Wn. App. at 533.

"Whether testimony constitutes an impermissible opinion on the defendant's guilt is determined from the circumstances of each case." *Olmedo*, 112 Wn. App. at 531. We look to factors, including the types of witnesses involved, the nature of the testimony, the nature of the charges, the type of defense, and other evidence before the jury. *Kirkman*, 159 Wn.2d at 928. "Testimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence, is not improper opinion testimony." *State v. Smiley*, 195 Wn. App. 185, 190, 379 P.3d 149, *review denied*, 186 Wn.2d 1031 (2016).

Moretti cites the following instances of the alleged improper opinion testimony or bolstering: testimony from a law enforcement officer, who photographed and observed Knapp's injuries to his hands, that the injuries were consistent with defensive wounds from being struck

with a blunt object; Knapp's testimony that nothing, including his injuries, affected his ability to remember the details of the incident; testimony from a law enforcement officer regarding Knapp's demeanor that he seemed reluctant to talk to the police; testimony from a law enforcement officer regarding his observation that although Knapp's injuries seemed to have stunned him, Knapp seemed to have good relocation of the incident; and testimony from Peterson that, other than Hill and Moretti, no one else was suspected to be involved in the robbery and assault.

A review of the testimony shows that none constituted an impermissible opinion on Moretti's guilt or a bolstering of the State's witnesses. *Olmedo*, 112 Wn. App. at 531. The law enforcement officers' testimony related to the facts of the investigation and their observations of Knapp's injuries and demeanor. Knapp testified regarding his direct knowledge and recollection of the incident.

Even if Moretti could show error, when viewed within the context of the other evidence presented to the jury, Moretti cannot show actual prejudice. Photos of Knapp's hands were admitted at trial. Other evidence, including Hoey's testimony, established Moretti as the other assailant involved in the incident. None of the specified testimony was a direct or indirect opinion as to Moretti's guilt. Therefore, we conclude that the prosecutor's conduct was proper because the cited testimony was neither improper nor manifest.

C.    CLOSING ARGUMENT

Moretti argues that the prosecutor committed further misconduct during closing argument. We disagree.

"In closing argument the prosecuting attorney has wide latitude to argue reasonable inferences from the evidence, including evidence respecting the credibility of witnesses." *State v.*

14

*Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). A prosecutor may argue that the evidence does not support the defense theory. *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994).

Moretti did not object to the prosecutor's closing arguments at trial. He fails to show that the prosecutor's comments were so flagrant and ill-intentioned that no curative instruction would have eliminated the prejudicial effect, and that the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 761.

A review of the prosecutor's closing argument shows that the prosecutor argued reasonable inferences from the evidence and made reasonable inferences regarding the credibility of the witnesses. The prosecutor also made a reasonable inference from the evidence that Moretti's defense theory was unsupported. Further, the trial court instructed the jury that the lawyers' remarks and arguments were not evidence, and to disregard any remark or argument not supported by the evidence or the jury instructions. Therefore, we conclude that the prosecutor's closing arguments were proper.

## II.    INEFFECTIVE ASSISTANCE OF COUNSEL

Moretti argues that he received ineffective assistance of counsel because his attorney failed to object by "sitting mute while . . . extremely prejudicial evidence and opinion testimony was elicited" at trial, and by failing to object to the prosecutor's conduct during closing argument. Br. of Appellant at 36. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on a claim of ineffective assistance of counsel,

the defendant must show both (1) that defense counsel's representation was deficient, and (2) that the deficient representation prejudiced the defendant. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). Representation is deficient if after considering all the circumstances, the performance falls below an objective standard of reasonableness. *Grier*, 171 Wn.2d at 33. Prejudice exists if there is a reasonable probability that except for counsel's errors, the result of the proceeding would have differed. *Grier*, 171 Wn.2d at 34. If either prong is not satisfied, the defendant's claim fails. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013).

Moretti references instances in the record where his lawyer did not object, but does not argue or explain why his lawyer's silence amounted to ineffective assistance of counsel. Nor does he argue that an objection would have been successful or that the court would have excluded the admitted evidence. Based on the discussion above, the prosecutor's conduct was proper during trial and closing argument. Therefore, we conclude that Moretti did not receive ineffective assistance of counsel because his attorney's representation was neither deficient nor prejudicial.

III.    PERSISTENT OFFENDER SENTENCE

Moretti argues that Moretti's sentence of life without the possibility of parole should be reversed because it amounted to cruel and unusual punishment, the POAA procedure violated his right to trial by jury and proof beyond a reasonable doubt, and because the State failed to meet its burden of proving that he was a persistent offender. We conclude that the court correctly sentenced Moretti as a persistent offender.

As an initial matter, Moretti did not object to the POAA sentence at his sentencing hearing. But because the alleged error affects a constitutional right, we consider Moretti's argument. RAP 2.5(a)(3); *State v. Rivers*, 130 Wn. App. 689, 697, 128 P.3d 608 (2005) (illegal or erroneous sentences may be challenged for the first time on appeal).

16

A persistent offender is a person who has been convicted in Washington of a most serious offense, and has on at least two other prior occasions been convicted of a most serious offense in this or any other state. RCW 9.94A.030(38)(a). The POAA states that a persistent offender shall be sentenced to life imprisonment without the possibility of release. RCW 9.94A.570. We review alleged constitutional violations de novo. *State v. Siers*, 174 Wn.2d 269, 273-74, 274 P.3d 358 (2012).

The SRA requires the trial court to conduct a sentencing hearing. RCW 9.94A.500(1). "The trial court must decide by a preponderance of the evidence whether a defendant has a criminal history and specify the convictions it has found to exist." *State v. Knippling*, 141 Wn. App. 50, 55, 168 P.3d 426, *aff'd*, 166 Wn.2d 93 (2009). "'Sentencing under the persistent offender section of the SRA raises two questions of fact, or "whether certain kinds of prior convictions exist and whether the defendant was the subject of those convictions."'" *Knippling*, 141 Wn. App. at 55-56 (quoting *State v. Lopez,* 107 Wn. App. 270, 278, 27 P.3d 237 (2001) (quoting *State v. Thorne*, 129 Wn.2d 736, 783, 921 P.2d 514 (1996), *aff'd*, 147 Wn.2d 515 (2002))).

First, Moretti argues that imposing a POAA sentence violated his rights under the Eighth Amendment and article I, section 14 of the Washington State Constitution.

The Eighth Amendment bars cruel and unusual punishment while article I, section 14 of the Washington State Constitution bars cruel punishment. The state constitutional provision is more protective than the Eighth Amendment in this context. Consequently, if we conclude that Moretti's sentence does not violate the more protective state provision, we need not further analyze the sentence under the Eighth Amendment. *State v. Witherspoon*, 180 Wn.2d 875, 887, 329 P.3d 888 (2014).

Moretti relies on a number of cases to propose that we should look beyond the factors set out in *State v. Fain*, 94 Wn.2d 387, 617 P.2d 720 (1980), and look at the offender himself.[5] However, the *Fain* factors are the appropriate method to measure proportionality:

> *Fain* provides four factors to consider in analyzing whether punishment is prohibited as cruel under article I, section 14: "(1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction."

*Witherspoon*, 180 Wn.2d at 887 (quoting *State v. Rivers*, 129 Wn.2d 697, 713, 921 P.2d 495 (1996)).

The first factor is the nature of the offense. "The nature of the crime of robbery includes the threat of violence against another person." *Rivers*, 129 Wn.2d at 713. Here, a violent offense occurred. Both robbery in the first degree and assault in the second degree are classified as a most serious offense under the POAA. RCW 9.94A.030(33)(a), (b); RCW 9A.56.200(2).

The second factor is the legislative purpose behind the statute. "[T]he purposes of the [POAA] includes deterrence of criminals who commit three 'most serious offenses' and the segregation of those criminals from the rest of society." *Rivers*, 129 Wn.2d at 713 (quoting *State v. Thorne*, 129 Wn.2d 736, 775, 921 P.2d 574 (1996)).[6]

---

[5] Moretti cites to *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015) for the proposition that we should look beyond the *Fain* factors and consider the defendant's youthfulness as a mitigating circumstance. Moretti argues that we should consider that he was only 20 years old when he committed his first predicate crime, and that he only has an eighth grade education. However, *O'Dell* did not involve a POAA sentence which does not have a sentencing range. *O'Dell* does not apply to this case. Therefore, we do not consider Moretti's relative youthfulness and education level in this analysis, even though the dissent does. At the sentencing hearing, there is only evidence of his age as it relates to this issue.

[6] Moretti emphasizes that the purpose of the POAA is to "warehous[e] from society of that small portion of the offender population deemed to pose the very greatest danger to public safety." Br. of Appellant at 41. But the purpose is broader in scope. It is true that part of the POAA's purpose

The third factor is the punishment that the defendant would have received in other jurisdictions. Moretti provides no argument as to how his offenses might be punished elsewhere. Even if we did consider what kind of punishment would be given for the offenses in other jurisdictions, this factor alone is not dispositive. *Witherspoon*, 180 Wn.2d at 888.

The final factor is the punishment meted out for other offenses in the same jurisdiction. "In Washington, all adult offenders convicted of three most serious offenses are sentenced to life in prison without the possibility of release under the POAA." *Witherspoon*, 180 Wn.2d at 888. Additionally, our Supreme Court has held that a life sentence imposed on a defendant convicted of robbery and found to be a persistent offender was not cruel and unusual punishment. *Rivers*, 129 Wn.2d at 714.

Considering the *Fain* factors, Moretti's life sentence without the possibility of release did not violate his constitutional rights under the Washington State Constitution. Therefore, we do not further analyze the sentence under the Eighth Amendment, and we conclude that Moretti's sentence does not violate the constitutional prohibition against cruel and unusual punishment.

Next, Moretti argues that he was entitled to a jury trial to prove his prior convictions before being sentenced to life without the possibility of release.

A defendant has a constitutional right to a trial by jury. U.S. CONST. amend VI; WASH. CONST. art. I, § 21. However, sentencing under the POAA does not violate a defendant's right to a jury trial or due process. *Witherspoon*, 180 Wn.2d at 893-94. Thus, in the POAA context, prior convictions need not be submitted to the jury to be proved beyond a reasonable doubt. *State v.*

---

is to reduce the number of serious offenders with tougher sentencing and put away the most dangerous criminals. RCW 9.94A.555(2). But it was also created to protect communities from "persistent" offenders and those with "active prior criminal histories." RCW 9.94A.555(1). It is not limited to those who pose the greatest danger to public safety.

*Wheeler*, 145 Wn.2d 116, 120, 34 P.3d 799 (2001); *State v. Smith*, 150 Wn.2d 135, 143-56, 75 P.3d 934 (2003).

Moretti relies on a number of United States Supreme Court decisions that state that any fact that increases the penalty for a crime must be submitted to a jury. This argument has been rejected in Washington. In *Witherspoon*, our Supreme Court stated that the "United States Supreme Court precedent, as well as [Washington]'s own precedent, dictate that under the POAA, the State must prove previous convictions by a preponderance of the evidence and the defendant is not entitled to a jury determination on this issue." 180 Wn.2d at 894.

Here, the State submitted certified copies of judgment and sentences for Moretti's prior convictions. It proved the convictions by a preponderance of the evidence and met its burden. We conclude that under the POAA, Moretti is not entitled to a jury trial to prove his prior convictions.

Lastly, Moretti argues that the State failed to meet its burden of proof because the record regarding his prior conviction for vehicular assault is insufficient to prove that the conviction was valid. He specifically argues that because his guilty plea statement struck the boilerplate language that the crime was a most serious offense, he was "affirmatively misadvised" about the potential consequences of entering the plea. Br. of Appellant at 62.

"A sentencing judge, law enforcement agency, or state or local correctional facility *may, but is not required to*, give offenders who have been convicted of an offense that is a most serious offense as defined in RCW 9.94A.030 either written or oral notice, or both, of the sanctions imposed upon persistent offenders." RCW 9.94A.561 (emphasis added); *State v. Crawford*, 159 Wn.2d 86, 93-94, 147 P.3d 1288 (2006). Moretti provides no authority to support his argument

20

that such notice was required when he signed his plea. Therefore, we conclude that the State met its burden of proving Moretti's vehicular assault conviction because the record was sufficient.[7]

IV.    LEGAL FINANCIAL OBLIGATIONS

Moretti argues that the sentencing court failed to consider his actual ability to pay before imposing LFOs and costs of incarceration. The State does not object to striking non-mandatory LFOs.

Before a sentencing court imposes LFOs on a defendant, the record must reflect that it considered the defendant's individual financial circumstances and made an individualized inquiry into the defendant's current and future ability to pay. *State v. Blazina*, 182 Wn.2d 827, 837-38, 344 P.3d 680 (2015). This inquiry also requires the court to consider other factors, such as incarceration and a defendant's other debts when determining a defendant's ability to pay. *Blazina*, 182 Wn.2d at 839.

Here, the court indicated on the judgment and sentence order that Moretti had the ability or likely future ability to pay any imposed LFOs but it did not make an adequate inquiry on this subject. Accordingly, we remand for the court to vacate the discretionary LFOs.

---

[7] The State must establish a defendant's criminal history, and the defendant bears the burden of establishing the invalidity of a prior conviction. *State v. Inocencio*, 187 Wn. App. 765, 776, 351 P.3d 183 (2015). A prior conviction cannot be collaterally attacked during the sentencing of an unrelated case. *State v. Ammons*, 105 Wn.2d 175, 188, 713 P.2d 719, 718 P.2d 796 (1986). To the extent Moretti attempts to collaterally attack his prior conviction of vehicular assault in this appeal, we conclude that Moretti must seek post-conviction relief.

V.      STATEMENT OF ADDITIONAL GROUNDS[8]

A.      RETUNING A VERDICT JURY INSTRUCTION

Moretti asserts that the jury was pressured into finding Moretti guilty because the jury instruction did not give them an option to be hung. He also asserts that the trial court pressured the jury to find him guilty as early as voir dire. We disagree.

As an initial matter, Moretti did not object to this instruction at trial. RAP 2.5(a). Under the Washington State Constitution, a unanimous jury verdict is required in all criminal trials. *State v. Stephens*, 93 Wn.2d 186, 190, 607 P.2d 304 (1980); *see* WASH. CONST. art. I, § 22. "[T]he right to a unanimous verdict is a fundamental constitutional right and may, therefore, be raised for the first time on appeal. *State v. Holland*, 77 Wn. App. 420, 424, 891 P.2d 49 (1995); RAP 2.5(a). Constitutional issues are reviewed de novo. *Siers*, 174 Wn.2d at 273-74. Alleged errors of law in jury instructions are also reviewed de novo. *State v. Fehr*, 185 Wn. App. 505, 514, 341 P.3d 363 (2015).

After the parties conducted voir dire, the court informed the jury:

[I]n a criminal case we require that all 12 jurors are unanimous in their decision. If you've ever been on a civil case you can have a 10 to two verdict or 11 to one verdict. That cannot happen in a criminal case. All 12 jurors have to agree before you can render a verdict.

RP (July 14, 2015) at 11-12. At the close of trial before deliberations, the court instructed in relevant part:

You must fill in the blanks provided in the verdict forms the words "not guilty" or the word "guilty", according to the decisions you reach for each count.
Because this is a criminal case, each of you must agree for you to return a verdict on each count. When all of you have so agreed, fill in each verdict form to express your decision on each count.

---

[8] Because the SAG is inconsistently paginated, we re-paginate the SAG for citation purposes, starting with the yellow cover sheet as page one.

Clerk's Papers CP at 56 (Instr. 20).

The trial court's statement at the start of trial is consistent with the law requiring unanimity in criminal cases. *Stephens*, 93 Wn.2d at 190. Therefore, the court did not err by making that statement. Regarding the court's jury instruction, it mirrors the concluding instruction found in WPIC 151.00.[9] Further, the law does not require jury instructions in a criminal trial to include that a jury is allowed to be hung, nor is it error to preclude such an instruction.[10] *State v. Thompson*, 169 Wn. App. 436, 493-94, 290 P.3d 996 (2012). Therefore, we conclude that the trial did not err and Moretti's constitutional rights were not affected by the trial court's statement or jury instruction.

B.     SHACKLES

Moretti asserts the trial court erred when it denied his motion for mistrial when a juror saw him in shackles. He also asserts that the court erred when it declined to dismiss the juror. We disagree.

As discussed above, we apply an abuse of discretion standard in reviewing a trial court's denial of a mistrial. *Rodriguez*, 146 Wn.2d at 269. "[S]hackling an accused imperils that person's constitutional right to a fair trial by reversing the presumption of innocence." *State v. Elmore*, 139 Wn.2d 250, 273, 985 P.2d 289 (1999). "[A] defendant challenging the use of restraints must make a threshold showing that the restraints had a 'substantial or injurious effect or influence on the

---

[9] 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTION CRIMINAL 151.00, at 622 (3d ed. 2008).

[10] Additionally, the "unable to agree" instruction is not the equivalent of a hung jury and therefore does not require treatment as a mistrial. *State v. Daniels*, 165 Wn.2d 627, 634, 200 P.3d 711 (2009). No instruction, standing alone, can instruct a jury how to hang. Judicial intervention is always required. *Daniels*, 165 Wn.2d at 635-36.

jury's verdict.'" *State v. Monschke*, 133 Wn. App. 313, 336, 135 P.3d 966 (2006) (quoting *In Pers. Restraint of Davis*, 152 Wn.2d 647, 694, 101 P.3d 1 (2004)). But the mere fact that a jury sees a defendant wearing shackles does not mandate reversal. *Rodriguez*, 146 Wn.2d at 270.

Moretti appeared at trial free of shackles. However, he alleged that a juror saw him in restraints during recess. When the court questioned the juror, she stated that she did not see Moretti in restraints. A security officer told the court that if the juror saw Moretti, his restraints had already been removed. The court denied the motion for a mistrial based on this evidence. Moretti has not shown that anything occurred to affect the verdict. We conclude that the trial court did not abuse its discretion by denying Moretti's motion for mistrial.

C.     TO-CONVICT JURY INSTRUCTION

Moretti asserts that the to-convict jury instruction for robbery in the first degree was erroneous because it did not include the implied element that the victim had an ownership, representative, or possessory interest in the property taken. We conclude that while the omission of the implied element was error, it was harmless.

As an initial matter, Moretti did not object to this instruction at trial on the basis he now asserts. RAP 2.5(a). But the failure to instruct the jury on every element of a charged crime is a manifest error affecting a constitutional right that can be considered for the first time on appeal. *State v. Mills*, 154 Wn.2d 1, 6, 109 P.3d 415 (2005); RAP 2.5(a)(3). Accordingly, we consider Moretti's assertion.

We review alleged errors of law in jury instructions de novo. *Fehr*, 185 Wn. App. at 514. A jury instruction is erroneous if it relieves the State of its burden to prove every element of a crime. *State v. DeRyke*, 149 Wn.2d 906, 912, 73 P.3d 1000 (2003). Specifically, a to-convict instruction must contain all essential elements of a crime. *DeRyke*, 149 Wn.2d at 910.

24

Whether a victim of robbery has ownership, representative, or possessory interest in the property taken is an "essential, implied element of first degree robbery." *State v. Richie*, 191 Wn. App. 916, 928, 365 P.3d 770 (2015). Here, this element is absent from the trial court's to-convict instruction, which relieved the State of its burden to prove every element of the crime of robbery in the first degree. The trial court's instruction was, therefore, erroneous because it did not include an essential element of the crime.

However, the omission of an essential element of a crime from the to-convict jury instructions may be subject to a harmless error analysis. *Richie*, 191 Wn. App. at 929. It is "harmless when it is clear that [the omission] did not contribute to the verdict; for example, when uncontroverted evidence supports the omitted element." *Richie*, 191 Wn. App. at 929. "However, 'error is not harmless when the evidence and instructions leave it ambiguous as to whether the jury could have convicted on improper grounds.'" *Richie*, 191 Wn. App. at 929 (quoting *State v. Schaler*, 196 Wn.2d 274, 288, 236 P.3d 858 (2010)).

Here, the uncontroverted evidence established that Knapp had approximately $1,000 on his person at the boat launch. It also established that Knapp's money was taken as a result of the assault. Based on the evidence and instructions, the jury convicted Moretti on proper grounds. Therefore, we conclude that although omitting the essential element was error, it was harmless.

D.     RECIDIVIST AGGRAVATOR UNCONSTITUTIONALLY VAGUE

Moretti asserts that his "exceptional sentence" should be reversed because the recent recidivist aggravator statute is unconstitutionally vague. SAG at 9. He also asserts that allowing the jury to hear that he was "freshly out of prison" was improper and heavily contributed to the jury's guilty verdict. SAG at 11.

A review of the record shows that Moretti did not receive an exceptional sentence. He received a sentence as a persistent offender.

In addition, Moretti asserts that the jury heard evidence that the incident occurred shortly after he was released from prison, but he does not inform us of the nature and occurrence of the alleged error. RAP 10.10(c) (we need not consider a defendant's SAG if it does not inform us of the nature and occurrence of the alleged error). Moretti's arguments are without merit.

E.      USE OF FALSE TESTIMONY

Moretti asserts that his due process rights were violated because the police coerced false testimony from Hoey and used it against him during trial. We disagree.

"A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *State v. Larson*, 160 Wn. App. 577, 594, 249 P.3d 669 (2011).

At trial, Hoey testified regarding her version of events of the incident. She testified that when law enforcement officers took her statement, the officers "switched [her] story around" and "[p]ut down stuff that [she] didn't write or say." RP (July 15, 2015) at 334.

But Moretti has not shown, and the record does not support, that the officers lied or coerced false testimony from Hoey. Nor has Moretti shown that the State knowingly used perjured testimony to obtain a conviction against him. Additionally, both Hoey and the law enforcement officers who spoke with her were subject to cross-examination. *See State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990) (the jury determines the credibility of witnesses). Therefore, we conclude that Moretti's due process rights were not violated.

F.       DOUBLE JEOPARDY & MERGER

Moretti asserts that the State erred by convicting him separately of two counts of assault in the second degree, one against Knapp and one against Ball, in addition to robbery in the first degree. He appears to assert that both assault convictions should be merged with the robbery conviction to avoid violating double jeopardy.[11] We agree with Moretti that the robbery conviction merged with the assault conviction against Knapp. But we disagree that the robbery conviction merged with the assault conviction against Ball.

We review double jeopardy claims de novo. *State v. Kelley*, 168 Wn.2d 72, 76, 226 P.3d 773 (2010). "The United States Constitution provides that a person may not be subject 'for the same offense to be twice put in jeopardy of life or limb.'" *State v. Chouap*, 170 Wn. App. 114, 122, 285 P.3d 138 (2012) (quoting U.S. CONST. amend. V). Similarly, article I, section 9 of the Washington State Constitution provides that a person may not be put in jeopardy twice for the same offense. *Chouap*, 170 Wn. App. at 122.

Assault in the second degree merges into robbery in the first degree when there is no independent purpose for each crime. *State v. Freeman*, 153 Wn.2d 765, 778, 108 P.3d 753 (2005). The crimes "may in fact be separate when there is a separate injury to 'the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element.'" *Freeman*, 153 Wn.2d at 778 (quoting *State v. Frohs*, 83 Wn. App. 803, 807, 924 P.2d 384 (1996)).

---

[11] After reviewing Moretti's SAG, we ordered the parties to file supplemental briefing on this issue. In its supplemental briefing, the State addressed Moretti's merger arguments as to the assault conviction against Knapp, but did not address the assault conviction against Ball. In his supplemental briefing, Moretti argued for a merger of the robbery and assault charges against Knapp, but not for dismissal of the assault conviction against Ball.

Here, there was no independent purpose between Moretti's assault against Knapp and the robbery against Knapp. The evidence established that Moretti assaulted Knapp with a deadly weapon in order to rob him. Both Ball and Knapp testified that the attackers demanded money from Knapp as they assaulted him. Ball testified that once the attackers had the money, they ran away. But Knapp testified that after the attackers took his money, they kept beating him.

The State relies heavily on Knapp's testimony that he continued to be assaulted after the attackers robbed him to show that the assault had an independent purpose from the robbery. But shortly after giving that testimony, Knapp testified, "They kind of gave (sic) me money and then they took off." RP (July 14, 2015) at 167. Other than Knapp's conflicting testimony, no other evidence in the record supports a conclusion that Moretti's assault had an independent purpose or effect from the robbery.

The State also relies on *State v. Prater*, 30 Wn. App. 512, 516, 635 P.2d 1104 (1981), in support of its argument. But the State mischaracterizes the facts in *Prater*, arguing that this court declined to merge the defendants' conviction for assault with their robbery conviction because the victim was assaulted "*after*" the robbery was completed. Supp. Br. of Resp't at 8.

In *Prater*, the defendants assaulted and robbed a couple in their home. 30 Wn. App. at 514. One of the defendants jabbed the female victim with a gun as she attempted to locate money. *Prater*, 30 Wn. App. at 514. When she brushed the gun away, the defendant struck her head with the gun. *Prater*, 30 Wn. App. at 514. As the female victim searched for money, one of the defendants shot the male victim in the face while he was on the floor. *Prater*, 30 Wn. App. at 514.

We held that the assault against the male victim "was no part of the robbery then being conducted for the purpose of obtaining money." *Prater*, 30 Wn. App. at 516. We declined to merge the conviction for assault against the male victim with the robbery conviction. *Prater*, 30

28

Wn. App. at 516. However, we merged the conviction for assault against the female victim with the robbery conviction because one of the defendants struck the female victim to intimidate and induce her to find money. *Prater*, 30 Wn. App. at 516.

This case is distinguishable because the evidence established that Moretti demanded money from Knapp as he assaulted Knapp. Even assuming Moretti continued to assault Knapp after he took Knapp's money, none of the evidence showed that the assault was separate and distinct from the robbery. Further, it is possible that Moretti continued assaulting Knapp for a short period to induce him to give more money or prevent him from resisting the taking of his money. *See* CP at 54 (an element of robbery in the first degree provides that "force or fear was used by the defendant to obtain possession of the property, or to prevent or overcome resistance to the taking.").

The State additionally relies on *State v. Mahoney*, 40 Wn. App. 514, 699 P.2d 254 (1985). In *Mahoney*, the defendants assaulted a woman in her garage and, when they allowed her to use the bathroom, demanded her wallet. 40 Wn. App. at 515. When the defendants found only a small amount of money in her wallet, they returned it and demanded her husband's wallet which they took. *Mahoney*, 40 Wn. App. at 515. We declined to merge the conviction for assault against the woman with the conviction for robbery against the woman's husband because at the time of her assault, there was no attempt of a robbery against her husband. *Mahoney*, 40 Wn. App. at 517.

This case is distinguishable because Moretti demanded money from Knapp as he assaulted Knapp. The evidence established that Moretti assaulted Knapp in order to rob him. Knapp provided conflicting testimony that Moretti continued to assault him after Moretti took his money. The State argues that this testimony clearly shows that taking Knapp's money was not the only motivation Moretti had for assaulting Knapp. But no other evidence in the record supports this conclusion and the State does not cite to any.

As to Moretti's assault against Ball and the robbery against Knapp, an independent purpose existed for each crime. Ball testified that Moretti said "give me the money" at the time Moretti attacked them. RP (July 14, 2015) at 123. But Ball testified that Moretti assaulted him because he "got in between" Moretti and Knapp as Knapp was an "old man." RP (July 14, 2015) at 119.

Accordingly, we conclude that the robbery in the first degree conviction merged with the assault in the second degree conviction against Knapp because there was no independent purpose for each crime. But we affirm the conviction for assault in the second degree against Ball.

We affirm, but remand for the trial court to strike all discretionary LFOs and vacate the assault in the second degree conviction against Knapp.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

I concur:

_____
Sutton, J.

BJORGEN, C.J. (dissenting) — This appeal presents the next step in the evolution of our law governing punishment of those with psychological traits of juveniles at the time of the offense. Moretti was sentenced as an adult under the Persistent Offender Accountability Act of the Sentencing Reform Act of 1981 (POAA), chapter 9.94A RCW, to mandatory life imprisonment without possibility of release. However, he committed one of the "strike" offenses that was essential to this sentence when he was 20 years old, well within the age at which our Supreme Court has recognized the characteristics of youth persist. *State v. O'Dell*, 183 Wn.2d 680, 692 n.5, 358 P.3d 359 (2015). The question, then, is whether our law consigns one to imprisonment without hope of release, with no whisper of human discretion and no consideration of the characteristics of youth, based in part on a crime committed when our law recognizes those characteristics persist. After *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), *O'Dell*, 183 Wn.2d 680, *and State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017), the answer must be no.

In *Miller*, the Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." 567 U.S. at 479. The court rested this holding on its recognition that

> [b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment.

*Miller*, 567 U.S. at 479.

The characteristics of youth on which *Miller* relied were those first summarized in *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). *Miller*, 567 U.S. at 472. In that decision the Court identified three general differences between adults and juveniles central to an Eighth Amendment analysis. First, juveniles more often display "'[a] lack of maturity and

31

an underdeveloped sense of responsibility,'" often resulting in "'impetuous and ill-considered actions and decisions.'" *Roper*, 543 U.S. at 569 (quoting *Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993)). This susceptibility means that their "'irresponsible conduct is not as morally reprehensible as that of an adult.'" *Roper*, 543 U.S. at 570 (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988)).

Second, juveniles "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Roper*, 543 U.S. at 569. This "vulnerability and comparative lack of control over their immediate surroundings" give juveniles "a greater claim than adults to be forgiven for failing to escape negative influences." *Id.* at 570.

Finally, "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles . . . less fixed." *Id.* at 570. Thus, "it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Id.* at 570.

In finding these differences, the Court in *Roper*, *Miller*, and the intervening *Graham v. Florida*, 560 U.S. 48, 68, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), drew on developments in psychology and neuroscience showing "'fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.'" *Miller*, 567 U.S. at 471-72 (quoting *Graham*, 560 U.S. at 68). These differences, the Court recognized, both lessened a juvenile's moral culpability, *Roper*, 543 U.S. at 571, and enhanced the prospect of reformation, *Miller*, 567 U.S. at 472. With these differences, each decision recognized that the penological justifications for imposing the harshest sentences were diminished for juveniles. *See Miller*, 567 U.S. 472.

Our state Supreme Court has embraced the reasoning of the *Roper* line of cases and extended that reasoning to hold that

> [t]he Eighth Amendment [r]equires [s]entencing [c]ourts [t]o [c]onsider [t]he [m]itigating [q]ualities of [y]outh at [s]entencing, [e]ven in [a]dult [c]ourt.

*Houston-Sconiers*, 188 Wn.2d at 18. The court read the Sentencing Reform Act (SRA), chapter 9.94A RCW, to allow courts to comply with this mandate. The court also held that the mandatory nature of the sentencing enhancements imposed violated the Eighth Amendment under the same reasoning. *Houston-Sconiers*, 188 Wn.2d at 25-26.

*Roper*, *Graham*, *Miller*, *a*nd *Houston-Sconiers* all dealt with crimes committed while the defendant was a juvenile. Moretti's POAA offenses were committed while an adult, the first at age 20. Thus, the specific holdings of these three decisions do not disclose any flaw in his POAA sentence, but their rationales and empirical bases do.

The law acknowledges that one's 18th birthday does not mark some abrupt and mystic translation into the mind of an adult. In *Roper*, 543 U.S. at 574, the United States Supreme Court recognized that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." Consistently with that recognition, the Washington Supreme Court held in *O'Dell*, 183 Wn.2d at 698-99, that

> a defendant's youthfulness can support an exceptional sentence below the standard range applicable to an adult felony defendant, and that the sentencing court *must exercise its discretion* to decide when that is.

(Emphasis added.) *O'Dell* reasoned that the same characteristics of youth based on the same scientific findings relied on by *Miller*, *Roper*, and *Graham* require a sentencing court to consider whether a youthful defendant should receive an exceptional sentence below the standard range under the SRA, even if the defendant was over 18 when he or she committed the offense. *O'Dell*, 183 Wn.2d at 689, 691-92, 695.

In reaching this holding *O'Dell* quoted A. Rae Simpson, *MIT Young Adult Development Project: Brain Changes*, Mass. Inst. of Tech. (2008), http://hrweb.mit.edu/worklife/youngadult/brain.html, for the proposition that "'[t]he brain isn't fully mature at . . . 18, when we are allowed to vote, or at 21, when we are allowed to drink, but closer to 25, when we are allowed to rent a car.'" *O'Dell*, 183 Wn.2d at 692 n.5. The court also quoted the finding in Jay N. Giedd, *Structural Magnetic Resonance Imaging of the Adolescent Brain*, 1021 Ann. N.Y. Acad. Sci. 77 (2004), that "[t]he dorsal lateral prefrontal cortex, important for controlling impulses, is among the latest brain regions to mature without reaching adult dimensions until the early 20s." *O'Dell*, 183 Wn.2d at 692 n.5. These neurological characteristics also formed the substrate of the constitutional reasoning in *Roper*, *Graham*, *Miller*, *and Houston-Sconiers*.

*O'Dell*, in other words, is instructing us that the very characteristics that underlie *Miller* and *Houston-Sconiers* may persist well into one's 20s. With that, the same characteristics that led to the Eighth Amendment analyses and holdings of *Roper*, *Graham*, and *Miller* and to the constitutional and statutory analyses and holdings of *Houston-Sconiers*, would apply equally to crimes committed at age 20, when Moretti committed his first "strike" offense. That is the ineluctable result of *O'Dell's* recognition of the psychological and neurological realities of the maturing mind.

The application of these principles to the POAA is more vexing. On one hand, these holdings apply to sentencing, and Moretti was sentenced under the POAA at age 32, well beyond the age at which *O'Dell* demands that we heed the characteristics of youth. However, Moretti was not sentenced to life without possibility of release for his last "strike" conviction or for any single "strike" conviction. Rather, his sentence rested equally on all three convictions, his first

34

as indispensable as the rest to the POAA sentence. Without that first conviction, he could not have been sentenced under the POAA. His POAA sentence, therefore, was as much a punishment for his first "strike" offense at age 20 as it was for any of the others.

In some ways, life imprisonment without possibility of release forfeits one's humanity more deeply than does execution. It condemns the prisoner to a captivity from which the only release is death. It disinherits the prisoner once and for all from the hope of freedom, the common inheritance that lies near the heart of what it is to be human.

Public safety may show the need for even that forfeit. *Miller* holds, though, that the mandatory imposition of that punishment for crimes committed while a juvenile is not tolerated by the Eighth Amendment. *Houston-Sconiers* holds that the Eighth Amendment requires that the characteristics of youth be considered in sentencing for crimes committed while a juvenile, whether or not mandatory. *O'Dell* requires that the same characteristics of youth that underlie *Miller* and *Houston-Sconiers* be considered in sentencing for crimes committed at an age these characteristics generally persist. The studies on which *O'Dell* relied show that range extends at least to age 20. *O'Dell*, 183 Wn.2d at 689, 691-92, 695.

Moretti was mandatorily sentenced to life imprisonment without possibility of release, a sentence that punished his offense at age 20 as it much as did any other "strike" offense. His mandatory sentencing involved not a shred of human discretion or consideration of the individual. Nor did it require that any heed be paid to the characteristics of youth at the time of his offense at age 20. *O'Dell* recognized that the same characteristics of youth that led to *Miller*'s condemnation of mandatory life without parole and *Houston-Sconiers*' requirement that youth be considered in sentencing generally are also present in young adulthood, certainly including age 20. *O'Dell* thus demands the same conclusions as in *Miller* and *Houston-Sconiers*

35

for crimes committed at age 20. Under the confluence of *Miller*, *Houston-Sconiers*, and *O'Dell*, Moretti's POAA sentence violated the Eighth Amendment.[12]

Bjorgen, C.J.

BJORGEN, C.J.

---

[12] In *State v. Thorne*, 129 Wn.2d 736, 921 P.2d 514 (1996), *State v. Rivers*, 129 Wn.2d 697, 921 P.2d 495 (1996), and *State v. Witherspoon*, 180 Wn.2d 875, 329 P.3d 888 (2014), our Supreme Court upheld the POAA against various challenges, including those based on the Eighth Amendment to the United States Constitution and article I, section 14 of our state constitution. None of these decisions, though, involved issues relating to the characteristics of youth, and each of them were decided before the court's ground-breaking opinions in *O'Dell* and *Houston-Sconiers*, which touch directly on the present issues. Thus, these prior POAA cases do not speak to this case.